IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| FIRST AMERICAN CORELOGIC, INC., | |
| Plaintiff, | CIVIL ACTION NO.  2:10-CV-132-TJW |
| v. | |
| FISERV, INC., | **JURY TRIAL DEMANDED** |
| INTELLIREAL, LLC, | |
| INTERTHINX, INC., | |
| LENDER PROCESSING SERVICES, INC., | |
| PRECISION APPRAISAL SERVICES, INC., | |
| REAL DATA, INC., | |
| REALEC TECHNOLOGIES, INC., | |
| ZILLOW, INC., | |
| AMERICAN FLOOD RESEARCH, INC., | |
| ELECTRONIC APPRAISER, INC., | |
| ESPIEL, INC., | |
| Defendants. | |

**MOTION FOR PROTECTIVE ORDER TO PRECLUDE
DISCLOSURE OF CONFIDENTIAL, ATTORNEY-CLIENT PRIVILEGED
AND ATTORNEY WORK PRODUCT INFORMATION
TO LENDER PROCESSING SERVICES, INC.**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................... 1

II.   BACKGROUND ...................................................................................................... 2

    A.   The Current Patent Infringement Suit.................................................................. 2

    B.   Walker And Chen's Involvement In CoreLogic's Patent Infringement
        Investigation........................................................................................................ 3

    C.   The Related State Case ........................................................................................ 5

    D.   CoreLogic's Attempts To Confer With LPS And LPS' Counsel Regarding
        Its Confidential, Privileged And Work Product Information............................... 7

III.  ARGUMENT ........................................................................................................... 8

    A.   The Court Should Protect From Disclosure CoreLogic's Privileged
        Information That Walker And Chen Clearly Possess ......................................... 8

    B.   CoreLogic Will Suffer Great Prejudice And Substantial Undue Burden If
        Its Privileged Communications Are Not Protected From Disclosure................. 11

        1.   Walker And Chen Were Privy To CoreLogic's Privileged
            Information Concerning Its Strategies For The Current Case While
            Secretly Negotiating Their Employment With Defendant LPS............... 12

        2.   LPS Faces No Hardship If Prohibited From Communicating With
            Walker And Chen Regarding CoreLogic And The Current Case........... 13

    C.   CoreLogic's Confidential And Privileged Communications Are In
        Jeopardy Of Being Disclosed To Defendant LPS................................................ 14

IV.   CONCLUSION....................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*G-I Holdings, Inc. v. Baron & Budd*,
  199 F.R.D. 529 (S.D.N.Y. 2001) .......................................................................................9, 15

*Hickman v. Taylor*,
  329 U.S. 495 (1947)....................................................................................................................10

*In re Auclair*,
  961 F.2d 65 (5th Cir. 1992) .........................................................................................................9

*MMR/Wallace Power & Indus., Inc. v. Thames Assocs.*,
  764 F. Supp. 712 (D. Conn. 1991).............................................................................................12

*Nguyen v. Excel Corp.*,
  197 F.3d 200 (5th Cir. 1999) .......................................................................................................9

*Perkins v. Gregg County, Tex.*,
  891 F. Supp. 361 (E.D. Tex. 1995).............................................................................................9

*United States v. Mobil Corp.*,
  149 F.R.D. 533 (N.D. Tex. 1993) ..........................................................................................9, 10

*Upjohn Co. v. United States*,
  449 U.S. 383 (1981)....................................................................................................................10

*Willy v. Admin. Review Bd.*,
  423 F.3d 483 (5th Cir. 2005) .......................................................................................................9

## FEDERAL STATUTES

Fed. R. Civ. P. 23(b)(3).................................................................................................................9
      26(b)(1) ...............................................................................................................................8
      26(b)(3) ...............................................................................................................................9
      26(c)(1) ...............................................................................................................................9

## DOCKETED CASES

*First American CoreLogic, Inc. v. Daniel Berman et. al*,
      No. 30-2010-00348820, (Cal. Super. Ct., Orange County Mar. 1, 2010) ..............................5

I.      **INTRODUCTION**

Plaintiff First American CoreLogic, Inc. ("CoreLogic") brings this motion to protect against the disclosure and possible misuse of its attorney client privileged and attorney work product information.  Specifically, CoreLogic seeks to establish prophylactic measures that will prevent its former employees who were significantly involved in CoreLogic's pre-filing investigation from disclosing, inadvertently or otherwise, CoreLogic's privileged information.

The threat is real and immediate.  From July 2009 until February 2010, Robert Walker and Renjie Chen assisted CoreLogic's in-house counsel with a pre-filing investigation of the current litigation.  During that process, they learned a great deal about the patent, the infringing products and CoreLogic's litigation strategy.  Then in February 2010, both men abruptly quit and went to work for Defendant Lender Processing Services, Inc. ("LPS").  Because Defendant LPS now claims Walker and Chen may be the persons most knowledgeable about its accused products, it is likely Defendant LPS will use them as witnesses in this case and discover, elicit and misuse Plaintiff's attorney-client privileged and attorney work product information concerning this lawsuit.

CoreLogic has made multiple requests that Defendant LPS provide assurances that it will take measures to prevent the disclosure of CoreLogic's confidential privileged information to anyone working for LPS' defense of the patent lawsuit.  Initially, LPS refused to acknowledge that any protections were needed.  Recently, however, LPS has advised CoreLogic that it has instructed all relevant persons to not communicate with Walker and Chen regarding the case.  CoreLogic believes that such protections are appropriate here and that they should last throughout the litigation.  Accordingly, CoreLogic moves the Court for a protective order preventing LPS or its counsel from communicating with Walker and Chen in connection with the

present action.

## II.   <u>BACKGROUND</u>

### A.   <u>The Current Patent Infringement Suit</u>

CoreLogic is one of the nation's largest providers of advanced property and ownership information, analytics and solutions.  As a core component of its business, CoreLogic manufactures and sells Automated Valuation Models ("AVMs") for real estate appraisal. CoreLogic's AVM products are used by lending institutions when granting loans to new and existing homeowners, as well as consumers looking to assess the value of a home.  CoreLogic's customers include the U.S. Government, Freddie Mac, banks and the general public.

The technology used in all CoreLogic's AVM products is protected by U.S. Patent No. 5,361,201 (the "patent-in-suit"), entitled "Real Estate Appraisal Using Predictive Modeling," issued on November 1, 1994, which is at issue in this action.  This technology concerns the use of predictive modeling for appraising real estate, which allows for fast, accurate and unbiased home appraisal.  Defendant LPS is a direct competitor of CoreLogic.  Both CoreLogic and LPS are in the business of providing integrated technology and outsourced services to the mortgage industry.   A flood of infringing AVM products developed and sold over the past several years by LPS and others has caused CoreLogic significant loss in market share.  Thus, CoreLogic initiated this patent lawsuit against LPS and others for willfully infringing this patented technology.  *See* Dk. No. 31 at 8.

Recently, however, Defendant LPS has taken an even more egregious step against CoreLogic by infiltrating the ranks of CoreLogic's AVM group and inappropriately recruiting and hiring key personnel responsible for CoreLogic's AVM products, including Walker and Chen.  These acts are the subject of a separate lawsuit filed in California state court.

B.     **Walker And Chen's Involvement In CoreLogic's Patent Infringement Investigation**

Beginning in 2009, CoreLogic's in-house counsel, Rouzbeh ("Rouz") Tabaddor, launched an investigation into the infringement of CoreLogic's patented AVM Technology. Declaration of Rouzbeh Tabaddor in Support of Plaintiff First American CoreLogic, Inc.'s Motion for Protective Order ("Tabaddor Decl."), ¶ 2.  This investigation specifically concerned the infringement of the patent-in-suit.  *Id.*

In mid 2009, Mr. Tabaddor brought in attorney Ben Davis from the law firm of Howrey LLP to assist in the investigation of the infringement of the patent-in-suit and to advise CoreLogic in that regard.  *Id.*, ¶ 3.  Thereafter, Mr. Davis and Mr. Tabaddor (hereafter "CoreLogic's Counsel") held a series of meetings with members of CoreLogic's AVM group to assess infringement of the patent-in-suit and discuss case strategy.  *Id.*  Walker attended at least one of these meeting and Chen attended at least two of these meetings.  *Id.*; Declaration of Barrington Dyer in Support of Plaintiff First American CoreLogic, Inc.'s Motion for Protective Order ("Dyer Decl."), ¶ 10, Ex. 10 at 350-351.  In addition, Mr. Tabaddor had a number of individual conversations with Walker and Chen concerning CoreLogic's plans to assert the patent-in-suit against LPS and other defendants.  Tabaddor Decl., ¶ 5.

Both Walker and Chen admit their involvement in this infringement investigation. During deposition in the state lawsuit, Walker testified that he was involved in discussions with Mr. Tabaddor and outside counsel about a potential patent lawsuit against LPS and others:

> Q.     While you were employed at First American [CoreLogic],
>        . . . were you involved in discussions with in-house counsel
>        about a potential patent suit against LPS and others?
>
> A.     Yes.
>
> Q.     And what . . . in-house attorney were you involved in discussion
>        with about that?

> A.     Rouz, Rouz Tabaddor.
>
> …………
>
> Q.     Were you involved in any meetings with outside counsel, potential outside counsel for First American [CoreLogic] to discuss a potential patent suit against LPS?
>
> A.     Come to think of it, I was.

Dyer Decl., ¶ 9, Ex. 9 at 271:25-272:12.  Chen testified the same:

> Q.     While you were employed at First American [CoreLogic], did you meet with any attorney, in-house attorney at First American [CoreLogic] regarding a potential patent lawsuit?
>
> A.     Yes.
>
> Q.     Ok . . . who was that attorney you met with?
>
> A.     Rouz Tabaddor.
>
> …………
>
> Q.     Were you involved in meetings with any outside attorneys . . . where it was discussed about a possible patent lawsuit against LPS?
>
> A      Yes.

Dyer Decl., ¶ 10, Ex. 10 at 350:9-351:16.

Indeed, from August 2009 up until their departure on February 16, 2010, both Walker and Chen worked substantially with Mr. Tabaddor to develop CoreLogic's litigation strategy for this action.  Tabaddor Decl., ¶¶ 5-6; Dyer Decl., ¶ 9, Ex. 9 at 273-274; Dyer Decl., ¶ 10, Ex. 10 at 350-353.  This work included the development of CoreLogic's infringement basis against defendant products, assessment of potential defenses and the evaluation of potential design-arounds.  Tabaddor Decl., ¶ 6.  Both Walker and Chen confirmed this fact as well.  Walker testified at deposition in the state lawsuit that he was asked to provide his opinion as part of the pre-filing investigation of this lawsuit:

> Q.    Okay.  Were you involved in the internal analysis at First American about that potential patent suit?
>
> A.    Tangentially insofar as my opinion was requested.

Dyer Decl., ¶ 9, Ex. 9 at 273:24-274:3.  Similarly, Chen testified that he was asked to provide information concerning the patent asserted herein:

> Q.    Did you provide any information to [Mr. Tabaddor] about the ['201] patent, and again, don't tell me what the information was, but just did you provide it?
>
> A.    Yes.

Dyer Decl., ¶ 10, Ex. 10 at 353:18-21.

## C.    The Related State Case

On March 1, 2010, Plaintiff CoreLogic filed a related lawsuit against LPS and Daniel Berman—also a former CoreLogic employee—for breach of fiduciary duty and various civil computer trespass claims.  *See First Am. CoreLogic, Inc. v. Berman et. al*, No. 30-2010-00348820 (Cal. Super. Ct., Orange County Mar. 1, 2010).  From December of 2007 until roughly August of 2009, Mr. Berman acted as the Senior Vice President ("SVP") of Mortgage Analytics for CoreLogic.  Thereafter he acted as SVP of Mortgage Industry Vertical until he resigned on September 30, 2009.  On information and belief, Mr. Berman accepted an offer of employment from Defendant LPS as early as mid September 2009 and began working for Defendant LPS on October 1, 2009 as Chief Operating Officer ("COO") of the Applied Analytics division.

As the SVP of Mortgage Analytics and then the SVP of Mortgage Industry Vertical for CoreLogic, Mr. Berman developed a detailed understanding of CoreLogic's personnel, including employee experience and specialization.  In particular, Mr. Berman had a unique and detailed understanding of the CoreLogic employees who specialized in and were critical to CoreLogic's AVM group.

While still employed by CoreLogic, Mr. Berman used his specialized understanding of CoreLogic personnel and targeted, among others, Walker and Chen from CoreLogic's AVM group.  At that time, Walker was a Vice President, and Chen was a modeler in the AVM group, responsible for designing CoreLogic's AVMs.  On information and belief, Defendant LPS knew of and actively encouraged Mr. Berman to solicit key CoreLogic personnel on behalf of LPS.

Further, Mr. Berman's solicitation continued after leaving CoreLogic to work for LPS. In particular, from November of 2009 through February 2010, Mr. Berman secretly met with Walker and Chen on numerous occasions and maintained consistent contact with them to arrange their defection from CoreLogic to LPS.  Dyer Decl., ¶ 9, Ex. 9 at 192:6-195:24, 202:23-204:8, 210:13-211:7, 238:12-23, 238:24-239:9, 248:5-9, 252:12-253:24; *id*., ¶ 10, Ex. 10 at 77:24-78:4, 81:5-82:18, 217:19-218:5, 222:18-223:9, 261:20-23, 267:13-14, 286:12-15.  To this end, Chen even created a personal e-mail account for the purpose of covert negotiation with LPS and Mr. Berman.  *Id*. at 43:10-24.

For their part, Walker and Chen promised to deliver "ideas" and "solutions" to LPS' AVM business.  In furtherance of their scheme, on January 26, 2010, Walker e-mailed Mr. Berman and stated, "I have a bunch of *your* ideas for your RVM [Realtor Valuation Model]." Dyer Decl., ¶ 9, Ex. 9 at 242:7-10.[1]  Similarly, Chen wrote Mr. Berman in a January 29, 2010 e-mail, "I'd like to deliver the AVM solution to you as quick as possible." *Id*., ¶ 10, Ex. 10 at 237:11-13.  Walker's and Chen's communications with Mr. Berman occurred simultaneously while they were conducting the pre-filing review and analysis of the patent issues related to the current case against LPS, their new employer.

On February 12, 2010, outside counsel for CoreLogic sent letters to both Mr. Berman and

Defendant LPS requesting they cease and desist all activities directed to the recruitment of

CoreLogic employees.  *See* Complaint at 8, *First Am. CoreLogic, Inc.*, Dkt. No. 1, No. 30-2010-

00348820. These letters requested that Mr. Berman and Defendant LPS respond by February 26,

2010.  *Id.*  Neither did.  *Id.*  Four days later, on February 16, 2010, Walker and Chen informed

CoreLogic that that they were leaving to work for LPS.  Dyer Decl., ¶ 9, Ex. 9 at 9:6-8; *Id.*, ¶ 10,

Ex. 10 at 14:16-20.

> **D.**     **CoreLogic's Attempts To Confer With LPS And LPS' Counsel Regarding Its Confidential, Privileged And Work-Product Information**

On April 19, 2010, CoreLogic's outside counsel sent a letter to LPS' CEO, Jeff Carbinier,

and LPS' General Counsel, Todd Johnson, requesting that Defendant LPS direct Walker and

Chen not disclose, discuss or use in any way CoreLogic's privileged and attorney work-product

information, and further, to take measures ensuring privileged information would not be elicited

from either Walker or Chen in connection with LPS' defense in this patent lawsuit.  *See* Dyer

Decl., ¶ 7, Ex. 7.

When neither LPS nor its counsel responded as requested, CoreLogic's outside counsel

left messages with LPS' outside counsel for the state case on April 30, 2010, and again on

May 3, 2010.  Declaration of Thomas Gray in Support of Plaintiff First American CoreLogic,

Inc.'s Motion for Protective Order ("Gray Decl."), ¶ 5.  LPS' outside counsel never responded to

the messages.  *Id.*

Thereafter, CoreLogic's outside counsel sent a second letter on May 7, 2010, again

requesting LPS provide assurances that it would take measures to prevent the disclosure of

CoreLogic's privileged information to anyone working for LPS' defense of this action.  *See* Dyer

---

[1] Mr. Walker attempted to excuse his behavior by explaining in his deposition that the "ideas" he was referring to in his e-mail were actually his ideas and that he came up with them for Mr. Berman.  Dyer Decl., ¶ 9, Ex. 9 at 243:11-20.  Of course, Mr. Walker was still employed by CoreLogic while he was assisting one of its chief competitors.

Decl., ¶ 8, Ex. 8.  On May 11, 2010, LPS' outside counsel for this matter responded by stating that there was no authority for CoreLogic's position and requesting additional information.  Gray Decl., ¶ 7.  During depositions taken in the state action, however, both Walker and Chen confirmed that no one from LPS had discussed screening measures with them, nor were they aware of any such measures.  Dyer Decl., ¶ 9, Ex. 9 at 276:15-18, 277:14-278:11;  *Id.*, ¶ 10, Ex. 10 at 359:23-360:2.

Eventually, LPS engaged the law firm of Pillsbury Winthrop Shaw Pittman LLP to represent it in the current case.  Until recently, Pillsbury refused to recognize that CoreLogic's privileged information was at risk and refused to take any action to protect such information from inadvertent or intentional disclosure.  On July 23, 2010, however, LPS' counsel finally confirmed that all relevant persons have been instructed not to communicate with Walker and Chen about the case or CoreLogic, under the condition that they would agree to such protections only until the scope of the protective order is worked out.  Gray Decl., ¶ 11.  LPS' counsel also informed CoreLogic that, although they had been on the job for only a few months, LPS would disclose Walker and Chen as the persons most knowledgeable about LPS' AVM products and likely intends to use Walker and Chen as witnesses in this case.  CoreLogic is deeply concerned by LPS' tactics which appear specifically designed to invade CoreLogic's privileged communications with its former employees.  As a result, CoreLogic requests that the Court enter a protective order expressly forbidding the recruited employees, Walker and Chen, from having any role in this case or communicating with LPS (including its counsel working on the current matter) with respect to any issues related to or arising from the patent litigation.

III.   **ARGUMENT**

A.   **The Court Should Protect From Disclosure CoreLogic's Privileged Information That Walker And Chen Clearly Possess**

Rule 26(b) of the Federal Rules of Civil Procedure states that discovery sought by the parties must be relevant and nonprivileged matter.  *See* FED. R. CIV. P. 26(b)(1).  Federal Rule of Civil Procedure 26(c) authorizes the Court, for good cause shown, to issue an order protecting a party or person from annoyance, embarrassment, oppression or *undue burden* or expense.  *See* FED. R. CIV. P. 26(c)(1) (emphasis added).  This includes the authority to issue a protective order prohibiting *ex parte* interviews with a party's former employees who possess knowledge regarding privileged communications, when the burden of a potential breach of the party's attorney-client privilege outweighs circumscribed discovery.  *See G-I Holdings, Inc. v. Baron & Budd*, 199 F.R.D. 529 (S.D.N.Y. 2001).

"The central purpose of the attorney-client privilege is 'to encourage full and frank communications between attorneys and their clients and thereby promote the broader public interests in the observance of law and the administration of justice.'"  *Willy v. Admin. Review Bd.*, 423 F.3d 483, 495 (5th Cir. 2005).  The privilege concerns communications made to an attorney or subordinate, in confidence, for the purpose of securing legal advice, assistance or representation.  *Perkins v. Gregg County, Tex.*, 891 F. Supp. 361, 363 (E.D. Tex. 1995); *see also United States v. Mobil Corp.*, 149 F.R.D. 533, 536 (N.D. Tex. 1993).  Communications between attorney and client are protected by privilege if they are intended to remain confidential and were made under circumstances so that the communication was reasonably expected and understood to be confidential.  *In re Auclair*, 961 F.2d 65, 70 (5th Cir. 1992).  That is certainly the case here.

The work product doctrine shares a similar purpose and has been codified as Federal Rule of Civil Procedure 26(b)(3).  Generally, materials prepared in anticipation of litigation by

attorneys are only discoverable upon a showing of "substantial need" and "undue hardship." FED. R. CIV. PROC. 23(b)(3).  However, "mental impressions, conclusions, opinions, or legal theories of an attorney" are absolutely privileged and are not discoverable.  *Nguyen v. Excel Corp.*, 197 F.3d 200, 210 (5th Cir. 1999) ("'An attorney's thoughts [are] inviolate . . . .' Even though an attorney's mental impressions and opinions fall outside of the attorney-client privilege, they also 'fall[ ] outside the arena of discovery [as their disclosure would] contravene[ ] the public policy underlying the orderly prosecution and defense of legal claims.'") (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)).

CoreLogic is the holder of any privileged communications between employees and its counsel, including its in-house counsel Rouzbeh Tabaddor.  *See Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981) (The attorney-client privilege applies to communications between corporate employees and counsel, made at the direction of corporate superiors in order to secure legal advice).  While Walker and Chen were employed by CoreLogic, they worked with Mr. Tabaddor to develop the litigation strategy for this patent infringement case.  Tabaddor Decl., ¶¶ 5-6.  This work included assessing infringement, developing a basis for asserting the patent herein against LPS and the other named defendants, evaluating invalidity arguments and the feasibility of potential design-arounds.  *Id*.  Thus, any communication made by Walker or Chen to Mr. Tabaddor for the purpose, and in preparation, of this lawsuit is privileged, and any communication from Mr. Tabaddor to Walker or Chen made for the purpose, and in preparation, of this lawsuit is privileged.  *See Mobil Corp.*, 149 F.R.D. at 536 ("The attorney-client privilege protects two related, but different, communications: (1) confidential communications made by a client to his lawyer for the purpose of obtaining legal advice; and (2) any communication from an attorney to his client when made in the course of giving legal advice, whether or not that

advice is based on privileged communications from the client.").

Both Walker and Chen were consulted by CoreLogic's Counsel for their expertise on AVMs in developing the strategy for this action.  Tabaddor Decl., ¶¶ 5-6.  Walker, for example, admits that his opinion concerning the filing of a patent infringement lawsuit was requested by CoreLogic's Counsel.  Dyer Decl., ¶ 9, Ex. 9 at 273:24-274:3.  Similarly, Chen admits that CoreLogic's Counsel consulted with him on the patent-in-suit, which concerns Real Estate Appraisal Using *Predictive Modeling*—Chen's field of expertise as an AVM modeler.  *Id*., ¶ 10, Ex. 10 at 353:18-21.  As a result of their significant involvement in the pre-filing investigation of infringement of the patent-in-suit, both Walker and Chen contributed to attorney work-product, leading to the filing of the present lawsuit.

Moreover, as the Vice President of the AVM Group, Walker was a part of CoreLogic's inner circle of management who received e-mails concerning CoreLogic's litigation strategy for this action.  Dyer Decl., ¶¶ 1-6; Exs. 1-6.  For example, Walker was privy to information concerning potential infringers, including LPS (*Id*. ¶¶ 1, 2, 4 and 5; Exs. 1, 2, 4 and 5), case strategy (*id*., ¶ 1; Ex. 1) and discussions concerning art in the field (*id*., ¶¶ 3 and 6; Exs. 3 and 6).  Due to the sensitive nature of initiating a patent litigation against competitors, Mr. Tabaddor directed that written communications be kept to a minimum.  Tabaddor Decl., ¶ 7.   All of these e-mails were directed to, or received from, Mr. Tabaddor, CoreLogic's in-house counsel, and are intended to remain confidential and privileged.

It follows that both Walker and Chen were privy to substantial attorney-client privileged and work-product information directly related to this case.  This privilege continues to belong to CoreLogic.  CoreLogic wishes to maintain this privilege and has not authorized Walker or Chen to disclose the information or otherwise waive the privilege.  *Id*., ¶ 8.

**B.** **CoreLogic Will Suffer Great Prejudice And Substantial Undue Burden If Its Privileged Communications Are Not Protected From Disclosure**

The impending burden resulting from a breach of CoreLogic's confidential and privileged information concerning its litigation strategy for this action substantially outweighs any hardship faced by Defendant LPS if prohibited from conducting *ex parte* interviews with Walker and Chen.

**1.** **Walker And Chen Were Privy To CoreLogic's Privileged Information Concerning Its Strategies For The Current Case While Secretly Negotiating Their Employment With Defendant LPS**

For seven months, Walker and Chen were privy to CoreLogic's confidential and privileged information building this case, before they suddenly and unexpectedly joined Defendant LPS.  Tabaddor Decl., ¶ 5.  Walker and Chen knew full well that they intended to defect to LPS, but neither took steps to stop or limit their involvement in the pre-filing investigation and authorization of the impending patent case against LPS and others.  Dyer Decl., ¶ 9, Ex. 9 at 241:4-7; *id*., ¶ 10, Ex. 10 at 41:19-23, 201:7-10.  Rather, they did just the opposite.  Even when they were secretly negotiating their employment with LPS, Walker and Chen continued participating in the pre-filing investigation of this action.  Walker, for example, began negotiating the terms of his and Chen's employment with LPS in December of 2009 while continuing privileged communications with CoreLogic's in-house counsel concerning the anticipated patent lawsuit against LPS through January 2010.  *See* Dyer Decl., ¶¶ 4-6; Exs. 4-6.

The present circumstances are similar to those presented in *MMR/Wallace Power & Indus., Inc. v. Thames Assocs.*, 764 F. Supp. 712 (D. Conn. 1991).  In that case, a former employee who worked with his employer's attorneys on pending litigation was retained as a consultant for the opposing party in the same litigation after his employer filed for bankruptcy. *Id.* at 727 (disqualifying opposing law firm for *ex parte* communications with former employee

because improperly obtaining information on adversary's trial strategy threatened to taint any future trial).  Like the former *MMR/Wallace* employee, Walker and Chen were privy to substantial confidential and privileged information for one party to the litigation, and then sought employment for the opposing party.  *Id.* at 714-715.  Here, however, the conduct is even more egregious.  Specifically, LPS and Walker and Chen were plotting their defection to LPS, one of the intended defendants, while still employed with CoreLogic and still assisting CoreLogic's Counsel in the pre-filing investigation.

CoreLogic has already lost two of the core members of its AVM group to LPS and is deprived of the benefits of their expertise and knowledge concerning the preparation for this lawsuit.  Should LPS gain CoreLogic's confidential and privileged information concerning CoreLogic's litigation strategy, it would gain an unfair advantage at additional expense to CoreLogic.  *See, e.g., id.* at 727 ("the confidential information [opposing counsel] presumably received [from the former employee] creates at least an appearance that defendant has obtained an unfair advantage at trial").  The highly unusual circumstances, and the improper, untrustworthy and suspicious nature of Walker's and Chen's activities prior to jumping ship from CoreLigic to LPS, demand significant protective measures be imposed to prevent the disclosure of CoreLogic's privileged information.  CoreLogic believes that the only way to adequately safeguard its privileged information is to prohibit Walker and Chen from communicating with anyone at LPS, or its counsel for this case, regarding the issues related to the current litigation.

    **2.**      **LPS Faces No Hardship If Prohibited From Communicating With Walker And Chen Regarding CoreLogic And The Current Case**

LPS overreaches when it claims that Walker and Chen are suddenly the persons most knowledgeable about LPS' AVM products.  Walker and Chen were only employed with

Defendant LPS for two months before Plaintiff CoreLogic commenced this action.[2]  Yet, LPS

has had its AVM product years before Walker and Chen joined LPS.  Indeed, CoreLogic

identified LPS as an infringer of the patent-in-suit back in August of 2009 and formed its basis

for infringement on LPS products available while Walker and Chen were employed with

CoreLogic.  Tabaddor Decl., ¶ 4.  It is hard to imagine that in the very short time that they have

been employed by LPS, Walker and Chen have become the people with the most knowledge

about LPS' AVM products.  Even if true, the protection of CoreLogic's privileged information

that directly pertains to the current case outweighs any inconvenience that LPS will experience

by not having to rely upon its fledgling employees as its primary witnesses about its products.

Importantly, Walker's and Chen's knowledge of matters pertaining to this case come

directly from their participation in CoreLogic's pre-filing investigation—either from a privileged

communication by CoreLogic's Counsel concerning litigation strategy or from a request by

CoreLogic's Counsel for analysis contributing in work-product.  Tabaddor Decl.,  ¶¶ 5-6.

Defendant LPS is entitled to neither.  Thus, Defendant LPS will suffer no hardship from being

prohibited from communication with Walker and Chen about this case.

### C.  <u>CoreLogic's Confidential And Privileged Communications Are In Jeopardy Of Being Disclosed To Defendant LPS</u>

Given the present scenario, where 1) LPS improperly recruited Walker and Chen from

CoreLogic; 2) Walker and Chen simultaneously worked with CoreLogic's counsel during the

pre-filing investigation of its claims against LPS; and 3) LPS now claims that Walker and Chen

are somehow the people most knowledgeable about LPS' AVM products, it is likely that LPS

has or will consult with Walker and Chen to establish its defense in this action.  Without

protections, such communications would significantly jeopardize and burden CoreLogic.

---

[2] Mr. Walker and Mr. Chen resigned from CoreLogic on February 16, 2010. Dyer Decl., ¶ 9, Ex. 9 at 9:6-8; Dyer

Further, the proposed protective order is needed regardless of whether Defendant LPS intends to extract CoreLogic's attorney-client privilege or work product information from Walker or Chen.  Once discussions with LPS and its counsel commence regarding the current patent case, Walker and Chen simply will be unable to segregate in their minds the privileged information from the non-privileged.  Thus, they very likely will disclose to LPS, or otherwise use in defense of this action, CoreLogic's privileged information —even if that is not LPS' intent.  *See G-I Holdings, Inc.*, 199 F.R.D. at 533 ("where the former employee is a lay person, it is unrealistic to think that he will know what information or communications are privileged").  Thus, the threat of disclosure or use of CoreLogic's privileged information is very real, especially in light of LPS', Walker's and Chen's improper and untrustworthy activities leading up to Messrs. Walker's and Chen's departure from CoreLogic.  CoreLogic is therefore justified in seeking significant protections in light of the unusual and serious circumstances and the obvious threat to its privileged information relating to the case at hand.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully requested that Plaintiff CoreLogic's motion for protective order to preclude LPS from conducting *ex parte* interviews with Walker and Chen in connection with the present action be granted.

---

Decl., ¶ 10, Ex. 10 at 14:16-20.  CoreLogic filed its complaint on April 16, 2010. Complaint, Dk. No. 1.

Dated:  August 6, 2010                          Respectfully submitted by,


                                                /s/  Eric H. Findlay
                                                Eric H. Findlay (Texas Bar No. 00789886)
                                                Brian Craft (Texas Bar No. 04972020)
                                                Findlay Craft, LLP
                                                6760 Old Jacksonville Hwy, Ste. 101
                                                Tyler, TX 75703
                                                E-mail:  efindlay@findlaycraft.com
                                                E-mail:  bcraft@finadlaycraft.com
                                                Tel:   (903) 534-1100
                                                Fax:  (903) 534-1137

                                                Fabio Marino
                                                Neel I. Chatterjee
                                                ORRICK, HERRINGTON & SUTCLIFFE
                                                1000 Marsh Road
                                                Menlo Park, CA 94025
                                                E-mail:  fmarino@orrick.com
                                                E-mail:  nchatterjee@orrick.com
                                                Tel:  (650) 614-7658
                                                Fax: (650) 614-7401

                                                Attorneys for Plaintiff
                                                FIRST AMERICAN CORELOGIC, INC.



## CERTIFICATE OF SERVICE

       This is to certify that all counsel of record who are deemed to have consented to electronic

service are being served with a copy of this document via the Court's CM/ECF system per Local

Rule CV-5(a)(3) on this the 6th day of August, 2010.


                                                /s/  Eric H. Findlay
                                                Eric H. Findlay

## <u>CERTIFICATE OF CONFERENCE</u>

Several letters have been sent to LPS regarding the matters at issue in this motion.  On July 7, 2010 a draft protective order was provided to counsel for defendant LPS that attempted to incorporate the relief sought in this motion.  Subsequent communications were held between Thomas Gray for plaintiff and Jeffrey Johnson for LPS in regard to a protective order but no agreement could be reached resulting in an impasse on July 29, 2010.  The matter is now open for the Court to resolve.


/s/  Eric H. Findlay
Eric H. Findlay